## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:23-cv-00114-MR-WCM

| | | |
|---|---|---|
| **JOANNA BLONDEAU, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| **MEDSTREAM ANESTHESIA, PLLC,** | ) ) | |
| **Defendant.** | ) ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Plaintiff's Motion for Conditional

Class Certification [Doc. 26].

## I.     PROCEDURAL BACKGROUND

Joanna Blondeau ("Blondeau") commenced this action by filing her

Complaint on April 25, 2023.  [Doc. 1].  Blondeau alleges that MedStream

Anesthesia, PLLC ("MedStream"), misclassified her and its other Certified

Registered Nurse Anesthetists ("CRNAs") as independent contractors to

avoid paying overtime wages required by the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201, *et seq.*  [Id. at ¶¶ 19, 33-34].  MedStream filed its

answer, denying Blondeau's allegations, on June 20, 2023.  [Doc. 8 at ¶ 19,

33-34]. On November 10, 2023, Blondeau moved for conditional certification of the following collective:

> All Certified Registered Nurse Anesthetists (CRNAs) who have worked over 40 hours in a workweek for at least one week for Medstream Anesthesia, PLLC as an independent contractor or contracted through Pivot Healthcare at any time since three years prior to the filing of this Complaint through judgment.[1]

[Docs. 26; 27 at 15]. MedStream responded on December 15, 2023, and Blondeau replied on December 29, 2023. [Docs. 29; 30]. Having now been fully briefed, Blondeau's Motion for Conditional Certification [Doc. 26] is ripe for disposition.

## II.  FACTUAL BACKGROUND

From approximately May of 2020 through December of 2022, Blondeau worked at Hilton Head Hospital as a CRNA on behalf of MedStream. [See Docs. 8 at ¶¶ 6-7; 28 at ¶ 2]. MedStream entered exclusive contracts with hospitals around the country to provide them with anesthesia related services. [Doc. 27-2 at 35:15-36:4]. To fulfill these agreements, it was MedStream's "business model" to hire CRNAs as independent contractors and to assign them to work in specific contracting

---

[1] Blondeau does not allege any claims against Pivot Healthcare ("Pivot") in her Complaint. [See generally Doc. 1]. However, in her memorandum accompanying her motion for conditional certification, she contends that MedStream, at minimum, jointly employed a group of CRNAs with Pivot. [See Doc. 27 at 15-16 n.3].

hospitals.  [Docs. 1 at ¶¶ 16-17; 27-2 at 75:2-5].  MedStream and Blondeau's

business, Joanna M. Blondeau, P.A., entered an "Independent Contractor

Agreement for Professional Services" that governed her work for

MedStream.[2]  [Doc. 27-4].  MedStream paid its independent contractor

CRNAs a fixed hourly rate, but it did "not pa[y] overtime compensation as

defined as time and-a-half their regular rate for hours over 40[.]"  [Doc. 27-2

at 86:19-21, 87:7-12].

However, in May of 2017, MedStream began "losing" CRNAs who did

not wish to work as independent contractors.    [Id. at 74:18-75:1].

Accordingly, Lance Player, MedStream's Chief Executive Officer, and two of

its other employees, formed a new entity, Pivot, that started hiring CRNAs

---

[2] The parties do not specifically address what effect, if any, the fact that Blondeau worked for MedStream through her personal business has on her claims under the FLSA. However, to give effect to its broad remedial purpose, the FLSA must be interpreted expansively and in such a way that substance is prized over form.  See Emmons v. City of Chesapeake, 982 F.3d 245, 251 (4th Cir. 2020).  The Supreme Court has noted that the FLSA's definitions of key terms are some of "the broadest definition[s] that ha[ve] ever been included in any one act."  United States v. Rosenwasser, 323 U.S. 360, 363 n.3 (1945); see also Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992).  Indeed, "employ" is defined as "to suffer or permit to work[,]" 29 U.S.C. § 203(g), "employee" is defined as "any individual employed by an employer," id. at § 203(e)(1), and "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." Id. at § 203(d).  Given these broad definitions, "an individual may be the employee of more than one employer at a . . . time."  Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 688 (D. Md. 2010) (citing Schultz v. Cap. Int'l Sec., Inc., 466 F.3d 298, 305 (4th Cir. 2006)).  As such, it is entirely possible that Blondeau worked for her own business while also being employed by MedStream.  Moreover, MedStream appears to recognize this, as it concedes that conditional certification of a collective action including Blondeau is appropriate in this matter.  [See Doc. 29 at 1-2].

3

exclusively as W2 employees. [Id. at 43:12-44:22, 74:11-75:14]. Pivot entered agreements with MedStream so that its CRNAs worked in the hospitals that contracted with MedStream. [Id. at 45:20-46:3]. Pivot paid its employee CRNAs "a fixed base salary every two weeks," which it calculated "based on the expectation they[] [were] going to work 46 weeks [per year], five days [per week], [and] eight hours [per day]." [Id. at 85:5-14]. However, Pivot defined its employee CRNAs' hourly rate of pay in their contracts and at the end of the year, if a CRNA worked more or less than expected, they were compensated for additional time, or "ha[d] to pay . . . back" excess compensation, at their hourly rate. [Id. at 85:21-86:18].

## III.  STANDARD OF REVIEW

The FLSA "embodies a federal legislative scheme to protect covered employees from prohibited employer conduct." Dearman v. Collegiate Hous. Servs., No. 5:17-cv-00057-RJC-DCK, 2018 WL 1566333, at *2 (W.D.N.C. Mar. 30, 2018) (quoting Houston v. URS Corp., 591 F. Supp. 2d 827, 831 (E.D. Va. 2008)). Section 216 of the FLSA provides that an employee subject to a violation of the FLSA may bring suit on behalf of herself and similarly situated employees. 29 U.S.C. § 216(b). Specifically, § 216(b) states that:

> An action to recover the liability prescribed in the preceding sentences may be maintained against any

4

> employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Id.  Accordingly, certification as a collective action under the FLSA requires: (1) that employees in the collective action be "similarly situated"; and (2) that all collective action members opt-in to the action by filing written consents. Dearman, 2018 WL 1566333, at *2.

While the Fourth Circuit has not established a process to determine whether prospective members are "similarly situated," courts in this Circuit generally follow a two-step approach.  See id. (collecting cases).  At the first stage, when the record is limited, the standard for determining whether putative members are similarly situated is "fairly lenient."  Id.  While "mere allegations will not suffice" and "some factual evidence is necessary," a plaintiff "generally need only make a relatively modest factual showing that [] a common policy, scheme, or plan [that violated the law] exists."  Adams v. Citicorp Credit Servs., Inc., 93 F. Supp. 3d 441, 453 (M.D.N.C. 2015) (alterations in original) (internal quotation marks omitted) (first quoting Bernard v. Household Int'l, Inc., 231 F. Supp. 2d 433, 435 (E.D. Va. 2015); and then quoting Mitchel v. Crosby Corp., No. DKC 10-2349, 2012 WL

4005535, at *2-*3 (D. Md. Sept. 10, 2012)). If the plaintiff makes this showing, the court may, in its discretion, conditionally certify the collective action and "authorize plaintiff['s] counsel to provide the putative class members with notice of the lawsuit and their right to opt in." Dearman, 2018 WL 1566333, at *2; see also Baylor v. Homefix Custom Remodeling Corp., 443 F. Supp. 3d 598, 605 (D. Md. 2020) (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 169 (1989)).

After discovery is "virtually complete," and if the defendant files a motion for decertification, the court proceeds to step two. Dearman, 2018 WL 1566333, at *2. At this second stage, courts apply a heightened standard and perform a more fact-specific analysis to determine whether members are similarly situated. Id. Accordingly, the Court will proceed with the first step of this analysis.

## IV. DISCUSSION

### A. Members of the Proposed Collective Action

MedStream concedes that conditional certification is appropriate as to its independent contractor CRNAs, but it objects to the inclusion of Pivot's employee CRNAs. [See Doc. 29 at 1]. Specifically, MedStream contends that Pivot's CRNAs are not similarly situated to its own because they were employed by a separate entity and were not classified by that entity as

6

independent contractors. [Id. at 12-13]. Blondeau does not specifically reference Pivot in her Complaint. [See generally Doc. 1]. However, she alleges that MedStream's "CRNA workforce consist[ed] of both CRNAs who [were] classified as independent contracts [sic] and CRNAs who [were] classified as W-2 employees . . . ." [Id. at ¶ 31]. MedStream did not hire any CRNAs as W-2 employees, [see Doc. 27-2 at 39:18-20], but, as discussed above, the CRNAs that Pivot hired as employees were part of the "workforce" providing services in the hospitals that contracted with MedStream. Blondeau more clearly explains in her memorandum accompanying her motion for conditional certification that she is contending that MedStream jointly employed Pivot's CRNAs for purposes of FLSA liability. [Doc. 27 at 15-16 n.3].

"[A] worker's employment by joint employers [is treated] as 'one employment' for purposes of determining compliance with the FLSA's wage and hour requirement." Salinas v. Com. Interiors, Inc., 848 F.3d 125, 134 (4th Cir. 2017). Thus, "joint employers [are held] jointly and severally liable for any violations of the FLSA." Id. (citing Schultz, 466 F.3d at 305, 307, 310). The "fundamental question" is "whether two or more persons or entities are 'not completely disassociated' with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise

codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." Id. at 141 (quoting *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 468 (3d Cir. 2012)).

In answering this question, the following, non-exhaustive, factors should be accounted for:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;
>
> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;
>
> (3) The degree of permanency and duration of the relationship between the putative joint employers;
>
> (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;
>
> (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and
>
> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate

> responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

Id. at 141-42. No one factor is dispositive, as the ultimate determination must be based on the totality of the circumstances. Id. at 142.

At this stage, Blondeau need only present evidence plausibly suggesting that MedStream jointly employed Pivot's CRNAs for conditional certification to be appropriate. See Presson v. Recovery Connections Cmty., No. 5:18-CV-466-BO, 2019 WL 3047114, at *4 (E.D.N.C. July 11, 2019); Berber v. Hutchinson Tree Serv., No. 5:15-CV-143-D, 2018 WL 3869980, at *5 (E.D.N.C. Aug. 14, 2018); Cedillos-Guevra v. Mayflower Textile Servs., Co., No. GLR-14-196, 2014 WL 7146968, at *3 (D. Md. Dec. 12, 2014); see also Chapman v. Saber Healthcare Grp., LLC, 623 F. Supp. 3d 664, 679-80 (E.D. Va. 2022) (the issue of joint employment is a "merits issue properly addressed at the decertification stage").

Here, Blondeau has presented evidence that Pivot was founded by three of MedStream's employees, including its Chief Executive Officer, to help MedStream obtain the services of CRNAs who did not wish to work for

it as independent contractors.[3]  [Doc. 27-2 at 43:10-44:11, 74:11-75:14].

Pivot exclusively provided the services of its CRNAs to MedStream.  [Id. at

45:20-46:3].    Additionally,  MedStream's  CEO,  Lance  Player,  handled

"everything for Pivot[,]" including the payroll, the malpractice insurance, and

setting the rate of pay for Pivot's employee CRNAs, which he based on the

rate MedStream paid its independent contractor CRNAs.  [Id. at 77:24-79:9,

80:15-16].   Moreover, Blondeau has presented evidence that the CRNAs

working at the hospitals that contracted with MedStream performed the same

job duties and were subject to the same MedStream policies, regardless of

whether they were independent contractors working for MedStream or if they

were employees hired by Pivot.  [Id. at 83:9-14, 142:17-145:19].  She also

declares  that  supervisory  workers  for  MedStream  were  responsible  for

scheduling  the  CRNAs,  managing  their  work,  ensuring  compliance  with

MedStream's policies, and disciplining the CRNAs as needed.  [See Doc. 28

at ¶¶ 6-7.  Taken together, this evidence plausibly suggests that MedStream

jointly employed Pivot's employee CRNAs.

MedStream contends that Pivot's CRNAs are not similarly situated to

its  own  because  Pivot  never  classified  its  CRNAs  as  independent

---

[3] Specifically, Blondeau has presented the testimony of MedStream's CEO, Lance Player,
who was also one of Pivot's founders. [See generally Doc. 27-2: Player Dep.].

contractors. [See Doc. 29 at 12-13]. However, as noted above, at the conditional certification stage, Blondeau's burden is fairly lenient, and she need only make a relatively modest factual showing that both groups of CRNAs were denied overtime wages as part of a "common policy or plan that violated the law[.]" See Smith v. Smithfield Foods, Inc., No. 2:21-cv-194, 2021 WL 6881062, at *6 (E.D. Va. Dec. 21, 2021).

Blondeau alleges in her Complaint that MedStream treated the CRNAs in its workforce the same, regardless of whether the CRNA was an independent contractor or a W2 employee. [See Doc. 1 at ¶ 31]. As noted above, MedStream paid its independent contractors a set hourly rate for the hours they worked. [See Doc. 27-4]. Pivot's CRNAs were paid a bi-weekly salary, which was determined by multiplying an hourly rate *based on* what MedStream paid its independent contractors by a set number of scheduled hours. [Doc. 27-2 at 78:14-79:9, 85:11-86:18]. However, Pivot defined its CRNAs hourly rates of pay in their contracts and if a CRNA worked more or less than the expected number of hours, the CRNA was either compensated for the extra time worked, or made to repay a portion of the wages they received, at their hourly rate. [Id. at 85:11-86:18].

Put differently, Pivot's employee CRNAs were compensated at their hourly rate for exactly the number of hours they worked, just as were

MedStream's independent contractor CRNAs. Moreover, neither entity paid its CRNAs overtime wages. [See id. at 85:5-87:9]. Taken together, this evidence is sufficient such that Blondeau has met her fairly lenient burden of demonstrating that all of the CRNAs were denied overtime wages based on a common scheme or plan. Accordingly, the Court will conditionally certify a collective action including Pivot's CRNAs that worked in the hospitals that contracted with MedStream.

## B. Temporal Scope of Collective

MedStream also objects to the temporal scope of Blondeau's proposed collective action, arguing that her proposed definition reaches both too far back and too far forward in time. [See Doc. 29 at 5-13].

Under the FLSA, claims must be brought "within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."[4] 29 U.S.C. § 255. However, the statute of limitations for non-parties runs until they file written consent with the Court opting into the collective. Id. at § 256. Thus, MedStream argues that even assuming it willfully violated the FLSA, some potential collective members' claims may

---

[4] "A claim for overtime pay accrues each time the employer issues a paycheck in violation of the FLSA." Guerra v. Teixeira, No. TDC-16-0618, 2018 WL 3756716, at *6 (D. Md. Aug. 8, 2018) (citing Cruz v. Maypa, 773 F.3d 138, 146 (4th Cir. 2014)).

expire before they receive notice of this action if a collective definition reaching back three years from the date of Blondeau's Complaint is approved. Therefore, MedStream contends that the collective should be limited to either three years prior to the date the notice is approved or three years prior to the date the notice is mailed, to prevent, to the extent possible, potential plaintiffs whose claims have expired from receiving notice of this action. [Doc. 29 at 5-10].

However, "[r]recognizing the FLSA's broad remedial purpose and because equitable tolling issues often arise as to individual opt-in plaintiffs, courts regularly permit notice to be fixed to the three-year period prior to the filing of the complaint." Singleton v. Am. Merch. Specialists, Inc., No. 5:22-cv-00123-KDB-DCK, 2023 WL 5923780, at *1 (W.D.N.C. Aug. 15, 2023); Daniel v. Stericycle Inc., No. 3:20-cv-00655-RJC-DCK, 2022 WL 16758227, at *3 (W.D.N.C. Oct. 11, 2022) ("Here, the Court finds it appropriate to allow an inclusive notice period. A more inclusive notice period . . . will allow putative collective members to receive notice and consider any colorable equitable tolling arguments."); see also Conner v. Cleveland Cnty., No. 1:18-cv-00002-MR-WCM, 2023 WL 3081295, at *1, *8-*9 (W.D.N.C. Apr. 24, 2023) (defining collective as reaching back three years from complaint); Staley v. UMAR Servs., Inc., 630 F. Supp. 3d 707, 717-18 (M.D.N.C. 2022)

13

(same); <u>Midkiff v. Anthem Cos., Inc.</u>, 640 F. Supp. 3d 486, 489, 496 (E.D. Va. 2022) (same).  Additionally, conditionally certifying a collective beginning three years prior to the date of Blondeau's Complaint "does not prejudice [MedStream] from later challenging any opt-in plaintiff's claim as being time-barred." <u>Daniel</u>, 2022 WL 16758227, at *3.  Thus, in its discretion, the Court will define the collective as beginning on April 25, 2020, three years prior to the date that Blondeau filed her Complaint.

MedStream also argues that Blondeau's proposed definition is too broad because it suggests that potential plaintiffs could opt into the collective after the opt-in period passes, until a final judgment is entered.  [<u>See</u> Doc. 29 at 11].  While it is unclear if this is what Blondeau intends because she did not reply to MedStream's argument, the collective must close on a clearly defined date for this action to proceed efficiently.  <u>See</u> <u>Hoffmann-La Roche</u>, 493 U.S. at 172 ("[T]he trial court, as part of its order, set a cutoff date for the filing of consents, <u>as it was bound to do</u> if the action was to proceed in diligent fashion.") (emphasis added); <u>see</u> <u>also</u> <u>Solais v. Vesuvio's II Pizza & Grill, Inc.</u>, No. 1:15cv227, 2016 WL 1057038, at *8-*9 (M.D.N.C. Mar. 14, 2016) (defining collective as closing on opt-in deadline set by court).  Accordingly, in the interest of clarity, the collective will be defined as closing on the date of the opt-in deadline.

14

## C.    Proposed Notice

Blondeau and MedStream have submitted competing proposed notices, and both object to different portions of the other's proposal. [See Docs. 27-6; 27-7; 29; 29-2; 29-3; 30]. "[C]ourts routinely order parties to create a joint notification plan after conditionally certifying FLSA collective actions." See Staley, 630 F. Supp. 3d at 717 (citing Adams, 93 F. Supp. 3d at 457). MedStream requests that it be allowed to meet and confer with Blondeau to amicably resolve their differences regarding the proposed notices out-of-court. [See Doc. 29 at 14-25]. Blondeau contends that she should not be required to confer with MedStream because the statute of limitations on potential opt-in plaintiffs' claims will continue to run during any delay. [See Doc. 30 at n.1]. However, "because parties are routinely ordered to attempt a joint proposal for notice forms . . . and [Blondeau] offers no explanation why a delay would be especially detrimental under the circumstances here, . . . any delay caused by this process will not be unreasonable." Staley, 630 F. Supp. 3d at 717. Accordingly, the parties will be ordered to confer and to submit either a mutually agreeable notice, or separate notices specifically addressing the issues that they were unable to resolve, within fourteen days of the entry of this Order.

**D.   Distribution Parameters**

In the interest of judicial economy, the Court will address the parties'

disputes regarding the distribution parameters of the notice so that they may

appropriately tailor their proposed notices, and so that the notice may be sent

more quickly once approved.[5]

**1.   Delivery of Notice**

Blondeau argues that potential opt-in plaintiffs should receive notice of

this action by U.S. mail, email, and text message.  [Doc. 27 at 18].  However,

MedStream objects, arguing that notice via email and text message are

improper.  [Doc. 29 at 15].  "It is well settled that notice by email and mail are

frequently permitted."  <u>Williams v. Charlotte-Mecklenburg Hosp. Auth.</u>, No.

3:20-cv-00242-RJC-DSC, 2022 WL 1019241, at *3 (W.D.N.C. Apr. 5, 2022);

<u>see</u> <u>also</u> <u>Stafford v. Bojangles Rest., Inc.</u>, 3:20-cv-00266-MOC, 2020 WL

6437481, at *3 (W.D.N.C. Nov. 2, 2020).  However, "in an effort to protect

the privacy of potential plaintiffs, courts require that plaintiffs show a special

need" before making defendants disclose the "telephone numbers" of

potential opt-in class members.  <u>Williams</u>, 2022 WL 1019241, at *3; <u>Staley</u>,

---

[5] The Court also notes that the parties agree that a 60-day notice period is appropriate. [<u>See</u> Docs. 27 at 22; 29-2 at 3].  Notice periods of 60 days are routinely approved.  <u>See</u>, e.g., <u>Moss v. Senior Care Carolinas, PLLC</u>, No. 3:20-cv-00137-FDW-DCK, 2020 WL 3472600, at *6 (W.D.N.C. June 25, 2020); <u>Geiger v. H.H. Franchising Sys., Inc.</u>, No. 3:17-cv-00738-FDW-DSC, 2018 WL 10689465, at *2 (W.D.N.C. Nov. 27, 2018).  Therefore, a 60-day notice period is approved.

630 F. Supp. 3d at 717.  Blondeau has made no showing that she is in "special need" of notifying potential opt-in plaintiffs via text message. Therefore, the Court will allow her to notify the potential opt-in plaintiffs via U.S mail and email, but not by text message.

## 2.  Reminder Notice

Blondeau requests that she be allowed to send a reminder notice by U.S. mail 30 days into the 60-day notice period.  [Doc. 27 at 18].  However, MedStream objects, arguing that a reminder notice would give the appearance that the Court was endorsing the merits of Blondeau's claims. [Doc. 29 at 17-18].  "[D]istrict courts in this Circuit have denied reminder notices for such a relatively short opt-in period" because they are "unnecessary."  Danford v. Lowe's Home Ctrs., LLC, No. 5:19-cv-00041-KDB-DCK, 2019 WL 4874823, at *7 (W.D.N.C. Oct. 2, 2019) (citing Moseman v. U.S. Bank Nat'l Ass'n, No. 3:17-cv-00481-FDW-DCK, 2018 WL 3616864, at *4 (W.D.N.C. June 12, 2018); Irvine v. Destination Wild Dunes Mgmt., 132 F. Supp. 3d 707, 711 (D.S.C. 2015)).  Thus, because sending a reminder notice is unnecessary in light of the relatively short opt-in period that the parties have agreed to, Blondeau's request to send a reminder is denied.

17

### 3. Contact Information / Means of Disclosure

. Blondeau requests that MedStream be ordered to produce a list of all potential opt-in plaintiffs, including their (1) full names, (2) last-known addresses, (3) last-known telephone numbers, (4) last-known email addresses, (5) the dates they worked for Defendant, and (6) the locations where they worked, within seven days of the Order conditionally certifying a class. [Doc. 27 at 22-23]. MedStream objects, however, contending that it should only be required to provide (1) the name of the contractor, (2) the last-known business address, and (3) the date range that the contractor worked for Defendant, since many of its independent contractor agreements are with "corporate entity contractors."[6] It also contends that it should be allowed twenty-one days to provide Blondeau with this information. [Id.].

Defendants in FLSA actions are routinely directed to disclose the full names, last known addresses, email addresses, and dates and locations of employment of potential opt-in plaintiffs. See Galleher v. Artisanal, LLC, 1:19-cv-00055, 2019 WL 5680357, at *3 (W.D.N.C. Oct. 31, 2019); Clark v. Williamson, No. 1:16cv1413, 2018 WL 1626305, at *5-*6 (M.D.N.C. Mar. 30,

---

[6] For instance, as noted above, MedStream entered the independent contractor agreement with Blondeau's business, Joanna M. Blondeau, P.A., rather than with Blondeau personally.

2018); Hart v. Barbeque Integrated, Inc., 299 F. Supp. 3d 762, 772 (D.S.C. 2017). Therefore, MedStream is directed to provide Blondeau, to the extent available, with the full names, last-known addresses, last-known email addresses, date ranges worked, and work locations of the potential opt-in plaintiffs within fourteen days of the entry of this Order.[7]

Moreover, to the extent that certain potential opt-in plaintiffs worked for MedStream through business entities, MedStream is further directed to provide Blondeau with the names of the contractors, the last-known business addresses, and the date ranges that the contractors worked for it within fourteen days of the entry of this Order. However, as discussed above, since Blondeau has made no "special showing" of a need to provide notice via text message, MedStream is not directed to disclose potential opt-in plaintiffs' telephone numbers.

MedStream also contends that it should be allowed to provide the required disclosures "in whatever data format the information currently exists in." [Doc. 29 at 20]. However, it cites no authority for this contention. To the contrary, defendants are regularly required to produce this information in "a computer-readable data file." See Galleher, 2019 WL 5680357, at *3;

---

[7] There is no prejudice to Plaintiff in allowing Defendant the additional seven days to produce this information, as the Court has ordered the parties to confer regarding the contents of the proposed notice.

19

Danford, 2019 WL 4874823, at *7 (requiring disclosure in an "electronic format"). Therefore, MedStream is directed to produce this information in a computer-readable data file.

## ORDER

**IT IS, THEREFORE, ORDERED** that Blondeau's Motion for Conditional Certification [Doc. 26] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)   The Court conditionally certifies the following collective:

> All Certified Registered Nurse Anesthetists (CRNAs) who worked for either MedStream Anesthesia, PLLC, as an independent contractor, or for Pivot Healthcare, as an employee, and who worked over 40 hours in a workweek for at least one week in a hospital that contracted with MedStream between April 25, 2020, and the opt-in deadline.

(2)   The parties are **ORDERED** to meet and confer within fourteen (14) days of the entry of this Order regarding the contents of the proposed notices. The parties are **FURTHER ORDERED** to submit either a mutually agreeable notice, or separate notices specifically addressing the issues that the parties were unable to resolve, within fourteen (14) days of the entry of this Order.

(3)   The notice period in this matter shall be sixty (60) days and shall run beginning on the date that the notice is approved.

(4)   Once the notice is approved, it shall be sent via U.S. mail and email.

(5)   No reminder notice shall be sent.

(6)   MedStream is **ORDERED** to provide Blondeau, to the extent available, with the full names, last-known addresses, last-known email addresses, date ranges worked, and work locations of the potential opt-in plaintiffs within fourteen (14) days of the entry of this Order.  Moreover, to the extent that certain potential opt-in plaintiffs worked for MedStream through business entities, MedStream is **FURTHER ORDERED** to provide the names of the contractors, their last-known business addresses, and the date ranges that the contractors worked for MedStream within fourteen (14) days of the entry of this Order.

(7)   MedStream is **FURTHER ORDERED** to provide this information in a computer-readable data file.

**IT IS SO ORDERED.**

Signed: March 18, 2024

Martin Reidinger
Chief United States District Judge

21